BURGOYNE LAW GROUP
Henry M. Burgoyne, III (SBN 203748)
870 Market Street, Suite 1113
San Francisco, CA 94102
Telephone: (415) 795-4070
Fax: (415) 680-2335
Hank@BurgoyneLawGroup.com

*Attorney for Plaintiff CrossInstall, Inc.*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA – SAN FRANCISCO

| | |
|---|---|
| CROSSINSTALL, INC., a Delaware corporation,<br><br>Plaintiff,<br><br>v.<br><br>CROSSCHANNEL, INC., a California corporation; and DOES 1 through 50, inclusive,<br><br>Defendants. | CASE NO.<br><br>COMPLAINT FOR:<br>1) COPYRIGHT INFRINGEMENT (17 U.S.C. § 501(A)-(B))<br>2) FALSE DESIGNATION OF ORIGIN / SERVICEMARK INFRINGEMENT (15 U.S.C. § 1125(A))<br>3) FALSE DESIGNATION OF ORIGIN / TRADE DRESS INFRINGEMENT (15 U.S.C. § 1125(A))<br>4) CYBERSQUATTING (15 U.S.C. § 1125(D)) |

## I.     INTRODUCTION

1.     Plaintiff CrossInstall, Inc. ("Plaintiff") was among the first and is perhaps the foremost creator and provider of "playable" mobile phone video game advertisements ("Playable Ads").

2.     Playable Ads are simplified and condensed video games that consumers can play on their mobile phones without downloading a standalone video game "app."

3.     Plaintiff's customers use Plaintiff's Playable Ads to "engage" consumers with their brands and to promote their mobile phone "apps" and related services.  Playable Ads are a particularly useful advertising vehicle for mobile phone video games, insofar as they allow end users to "test drive" such games without downloading entire game apps.

4.      As a result of its diligence, acumen, creativity and customer service, Plaintiff has earned an outstanding reputation amongst the purchasers of Playable Ads and related services.

5.      This action arises from Defendant CrossChannel, Inc. ("Defendant")'s brazen attempt to unfairly compete with Plaintiff in the Playable Ad marketplace, both by exploiting Plaintiff's good reputation and by copying certain software code constituting Plaintiff's Playable Ads.

6.      Plaintiff brings this action (the "Action") in an effort to restrain Defendant from further misappropriation of Plaintiff's intellectual property and goodwill, and to recover Defendant's revenues resulting from Defendant's unlawful acts.

## II.      PARTIES

7.      Plaintiff CrossInstall, Inc. ("Plaintiff") is a Delaware corporation with its principle place of business in San Francisco, California.

8.      On information and belief, Defendant CrossChannel, Inc. is a California corporation with its principle place of business in San Mateo, California.

9.      Plaintiff is ignorant of the true names and capacities of the defendants sued herein as DOES 1 through 50, inclusive, and therefore sues these defendants by such fictitious names ("Doe Defendants," and collectively with Defendant, "Defendants").  Plaintiff will request leave to amend this Complaint to allege Doe Defendants' true names and capacities when the same are ascertained.  On information and belief, each of the fictitiously named Doe Defendants is responsible in some manner for the acts and/or omissions herein alleged and Plaintiff's injuries were proximately caused by said acts and/or omissions.

10.      On information and belief, at all times mentioned herein, each and every one of Defendants was aiding and abetting, and conspiring with, and otherwise acting in concert and with a common intention with, each of the remaining Defendants; and each and every one of Defendants was the agent, employee, principal, proxy, guardian, surrogate, alter ego or other legal representative of each of the remaining Defendants, and in doing the things hereinafter alleged, was acting within the course and scope of such capacity and with the consent, permission, and authorization of each of the remaining Defendants.  Thus, Defendants are, and

1   each of Defendants is, directly or indirectly, in whole or in part, vicariously or otherwise liable

2   for the acts or omissions of the other Defendants, individually and collectively.

3                          **III.    JURISDICTION AND VENUE**

4          11.    This Action arises out of Defendants' violations of the federal Copyright Act of

5   1976, 17 U.S.C. § et seq. ("Copyright Act"), the Lanham Act, 15 U.S.C. §§ 1051 et seq.

6   ("Lanham Act"), and the Anticybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d)

7   ("ACPA").  Thus, this Court has original jurisdiction over the subject matter of this Action

8   pursuant to 28 U.S.C. § 1331.

9          12.    On information and belief, this Court has personal jurisdiction over Defendants

10  because at all relevant times Defendants resided and conducted business in; and had paying

11  clients in; and directed marketing, advertising and other business communications and activities

12  toward; and directed the alleged wrongdoing toward; and knowingly, intentionally and/or

13  recklessly caused harm to Plaintiff and others, in each case in the State of California and in this

14  District.

15         13.    On further information and belief, Defendants have sufficient minimum contacts

16  with the State of California and this District, and have otherwise intentionally availed themselves

17  of the benefits and resources of the State of California and this District, such that this Court's

18  exercise of personal jurisdiction over Defendants is and would be entirely consistent with

19  traditional notions of fair play and substantial justice.

20         14.    On information and belief, venue is proper in this District under 28 U.S.C. §

21  1391(b) because a substantial part of the events giving rise to Plaintiff's claims occurred here;

22  and because the majority of the witnesses and the bulk of documentary and other evidence are

23  located here; and because Defendants knowingly, intentionally and/or recklessly caused harm to

24  Plaintiff here.

25                        **IV.    INTRADISTRICT ASSIGNMENT**

26         15.    On information and belief, assignment to this (San Francisco) District is proper

27  under Civil Local Rules 3-2(c) and (d) because a substantial part of the events or omissions that

28  gave rise to the claim occurred in; and because the party holding the rights, title and interest in

and to the intellectual property at issue is situated in; and because Defendants directed the alleged wrongdoing toward; and because Defendants knowingly, intentionally and/or recklessly caused harm to Plaintiff and others in, San Francisco County.

## V.     FACTUAL BACKGROIUND

### A.   Plaintiff's Reputation as the Leading Provider of "Playable Ads" and Plaintiff's "CrossInstall" Mark.

16.     Plaintiff began performing advertising-related services for mobile phone "app" publishers in 2012.

17.     As a result of Plaintiff's diligence, programming acumen, creativity, customer service and commitment to client satisfaction, Plaintiff has earned a reputation among mobile phone app publishers as a reliable, cost-efficient and effective advertising vendor.

18.     On information and belief, Plaintiff's "CrossInstall" servicemark (the "Mark") is widely known and recognized by mobile phone app publishers as pertaining to Plaintiff.  On further information and belief, as a result of Plaintiff's strong reputation, the Mark has become synonymous with Plaintiff and with the high-quality, high-value advertising services that Plaintiff provides.

19.     In recognition of the apparent secondary meaning and goodwill associated with the Mark, in May 2016 Plaintiff applied to register the Mark on the U.S. Patent and Trademark Office ("PTO")'s Principal Register.  Plaintiff's application still is pending with the PTO.

20.     Plaintiff's registration application sought to register the Mark in connection with "[the provision of] advertising services for mobile applications."  A true and correct copy of a printout from the PTO's website reflecting Plaintiff's application is attached hereto as **Exhibit A**.

21.     Starting in or about August 2015, Plaintiff began offering its customers "playable" mobile phone video game ads ("Playable Ads") and related services.

22.     Playable Ads are miniature video games designed to engage consumers, increase brand awareness, and encourage consumers to download or purchase mobile phone apps or other services.

23.     Playable Ads are particularly effective in marketing mobile phone video games,

1  insofar as they permit consumers to "test drive" games without having to download full-blown

2  game apps or to register with such apps' publishers.

3          24.     On behalf of Plaintiff's app publisher clients, Plaintiff "serves," or makes

4  available to consumers, its Playable Ads through mobile phone advertising platforms like Google

5  and Twitter.

6          25.     To date, Plaintiff has created approximately 700 Playable Ads for a wide range of

7  mobile phone app publishers and mobile apps.

8          26.     On information and belief, Plaintiff remains the most established and most

9  respected provider of Playable Ads.  Despite the emergence of varied competitors, Plaintiff

10  estimates that it retains a 30% share of the U.S. Playable Ad market.

11      **B. Plaintiff's Trade Dress and the Proprietary Software Code Comprising Plaintiff's**

12          **Playable Ads.**

13          27.     Plaintiff's Playable Ads consist of software code (collectively, the "Code")

14  written in computer languages — HTML5, CSS, Javascript — that are capable of being run in

15  and on the Internet browsers of most mobile phones.

16          28.     Notable amongst the Code is a "wrapper" (the "Wrapper Code") that embodies

17  aesthetic and other elements necessary to the operation of Plaintiff's Playable Ads.

18          29.     Without the Wrapper Code, Plaintiff's Playable Ads would not run.  And without

19  other of Plaintiff's Code, the Wrapper Code would be of no value or use.

20          30.     The Wrapper Code consists of separate files named, without limitation,

21  "mraid_wrapper.js," "mraid_wrapper.css," "image_loader.js," "localization.js," and the like.

22          31.     Plaintiff's Playable Ads also consist of additional software code unique to each of

23  Plaintiff's Playable Ads (the "Game Code.")  The Game Code consists of additional individual

24  files identified with names like "game.js," "ad.js," "preloader.js" and the like.

25          32.     The Wrapper Code reproduces several non-functional design elements that are

26  both ubiquitous in, and unique to, Plaintiff's Playable Ads (collectively, the "Trade Dress").

27          The Trade Dress consists of, without limitation:

28              a.   The "Header," a visual feature appearing at the top of all Plaintiff's Playable Ads

1       and consisting of a uniform size and style of text box incorporating a game title as

2       written in a unique and consistent size and font of text;

3      b. The "Game Loading Bar," a distinctive animated graphic appearing at the start of

4       Plaintiff's Playable Ads and reflecting the mobile phone's progress in

5       downloading and preparing to execute the Code; and

6      c. The "Game Loading Text," a unique size and font of text that appears in

7       conjunction with the Game Loading Bar.

8     33.    On information and belief, the Trade Dress is widely known and recognized by

9 mobile phone video game publishers.  Also on information and belief, as a result of that

10 recognition and Plaintiff's strong reputation, the Trade Dress has become synonymous with

11 Plaintiff and with the high-quality, high-value advertising services that Plaintiff provides.

12     34.    The Code was developed almost entirely by Plaintiff's employees.  The only

13 portions of the Code not authored by Plaintiff's employees are bug fixes, updates and the like

14 written by contractors with whom Plaintiff has effective "work for hire" and/or intellectual

15 property (including copyright) assignment agreements.

16     35.    On June 16, 2017, Plaintiff filed an application to register with the U.S. Copyright

17 Office Plaintiff's copyright in and to the February 24, 2016 version of the Wrapper Code

18 ("Wrapper Version 1").  A true and correct copy of that application is attached hereto as **Exhibit**

19 **B**.

20    **C. Defendant's Misappropriation of the Code, to include the Wrapper Code and**

21      **Certain of the Game Code.**

22     36.    On information and belief, in or about February 2017, Defendant also began

23 marketing Playable Ads and related mobile phone video game advertising services.

24     37.    In or about March 2017, Plaintiff was surprised to find what it initially thought to

25 be one of its own Playable Ads on an advertising platform where Plaintiff hadn't served that ad.

26     38.    Upon examination of that Playable Ad, Plaintiff discovered several "URLs"

27 indicating that the Playable Ad in question had been served not by Plaintiff, but by Defendant.

28     39.    About that same time, Plaintiff began receiving feedback from Plaintiff's mobile

phone video game publisher clients regarding Playable Ads that appeared to have been created by Plaintiff but that violated advertising platform advertiser rules and guidelines.  Upon investigation, Plaintiff discovered that those Playable Ads, too, had been served by Defendant.

40.     Subsequent to further inquiry and investigation, and on information and belief, Plaintiff discovered that Defendant had published at least five Playable Ads that reproduced most or all of the Wrapper Code and, in varying degrees, certain of the Game Code (the "Infringing Ads").

41.     On information and belief, the Infringing Ads included, without limitation, those that Defendant has named "ih_jccd_ms_fight2" (advertising the Mobile Strike mobile phone video game), 1.8mb_sniper_playable_IOS-Android_en_1_jccd (also advertising the Mobile Strike mobile phone video game), and "em_ios_uber_race_2" (advertising for Uber Technologies, Inc.).

42.     On information and belief, as a result of Defendant's reproduction and publication of the Wrapper Code in connection with the Infringing Ads, the GUIs of the Infringing Ads all manifest and reflected Plaintiff's Trade Dress.

43.     As a matter of practice, prior to February 2017 as afterward, Plaintiff "minimized" the Code comprising its Playable Ads prior to serving them.

44.     On information and belief, Plaintiff's minimization of its Code made such software code practically impossible to decipher or review absent an "unpacking" process.

45.     On information and belief, the process of unpacking of the Code comprising Plaintiff's Playable Ads would have required, and would require, a substantial investment of time by an experienced software programmer equipped with high-level analytical and programming tools.

**D. Defendant's Misappropriation of the Mark, the Trade Dress, and Plaintiff's Goodwill and Reputation.**

46.     On information and belief, in or about the spring of 2016, Defendant began marketing mobile phone app advertising services under the "CrossChannel" name.

47.     On information and belief, also in or about the spring of 2016, Defendant first

1  published at the domain name "crosschannel.com" a website advertising its mobile phone app

2  advertising services.

3       48.     Starting in or about March and continuing into May 2017, Plaintiff's clients and

4  prospective clients expressed increasing confusion between and among Plaintiff and its Playable

5  Ads, and Defendant and the Infringing Ads (the "Customer Confusion").

6       49.     On information and belief, certain of the Customer Confusion arose from the

7  confusing similarity of Defendant's "CrossChannel" name to the Mark.

8       50.     On information and belief, other of the Customer Confusion arose from the

9  Infringing Ads' embodiment of the Trade Dress.

10      51.     Each advertising platform has its own set of advertiser rules and guidelines.

11  Violations of a platform's advertiser rules and guidelines can result in an app publisher or

12  advertising vendor being banned from that platform.

13      52.     Plaintiff's mobile phone app publisher clients rely on Plaintiff to understand and

14  to follow all advertising platform rules and guidelines, so as to prevent interruption of those

15  clients' advertising.

16      53.     The Customer Confusion was particularly troubling to Plaintiff because certain of

17  the Infringing Ads violated advertising platform advertiser rules and guidelines, thus

18  endangering and damaging Plaintiff's previously strong reputation as a reliable and trustworthy

19  vendor.

20      **E. Plaintiff's Attempts to Resolve the Parties' Dispute Prior to Litigation.**

21      54.     On or about March 3, 2017, counsel for Plaintiff sent a cease-and-desist letter to

22  counsel for Defendant, requesting that Defendant immediately cease to use the Code.

23      55.     On March 8, 2017, counsel for Defendant responded to counsel for Plaintiff that

24  Defendant was not in possession of, and had not used, any of Plaintiff's Code.

25      56.     On information and belief, subsequent to March 8, Defendant began to

26  "obfuscate" the software code comprising the Infringing Ads and other of Defendant's Playable

27  Ads.

28      57.     Defendant's obfuscation of the software code comprising its Playable Ads made it

1   considerably more difficult for Plaintiff to determine whether, and the extent to which,

2   Defendant continued to use some or all of the Code.  Nevertheless, Plaintiff was able to

3   reasonably confirm Defendants' continued use of certain of the Code subsequent to March 8.

4        58.     Plaintiff and Defendant exchanged several additional rounds of communications

5   without any apparent movement toward a resolution.  Accordingly, Plaintiff filed this Action.

6        59.     On information and belief, the Infringing Ads likely have generated either a high

7   six-figures if not seven-figures in revenues and/or profits for Defendant, which revenues and/or

8   profits Plaintiff here seeks to recover.

### VI.    PLAINTIFF'S CAUSES OF ACTION

**First Cause of Action**
**Copyright Infringement**
**(17 U.S.C. § 501(a)-(b))**

12        60.     Plaintiff incorporates by reference all prior allegations as though fully set forth

13   herein.

14        61.     The Code, to include without limitation the Wrapper Code, constitutes a literary

15   work, audiovisual work and/or computer program, in each case within the meaning set forth in

16   17 U.S.C. § 102.

17        62.     On information and belief, the Wrapper Code embodies original and unique

18   expression, including without limitation as reflected in the Wrapper Code's syntax, structure,

19   sequence and organization.

20        63.     Plaintiff is the owner and holder of the exclusive copyright in and to the Wrapper

21   Code.

22        64.     Plaintiff's exclusive copyright in and to the Wrapper Code is valid, and has been

23   the subject of copyright registration applications as filed by Plaintiff with the U.S. Copyright

24   Office.

25        65.     As a consequence of its exclusive and valid copyright in and to the Wrapper

26   Code, Plaintiff has the exclusive right to reproduce, prepare derivative works of, distribute and

27   publicly perform the Wrapper Code.

28        66.     On information and belief, Defendant reproduced, prepared derivative works of,

1    distributed and/or publicly performed the Wrapper Code, including without limitation as

2    encompassed by, and in connection with, the Infringing Ads.

3        67.    On information and belief, Defendant's reproduction, preparation of derivative

4    works of, distribution and/or public performance of the Wrapper Code was unlawful and in

5    violation of Plaintiff's exclusive rights as herein alleged.

6        68.    On information and belief, Defendant's reproduction, preparation of derivative

7    works of, distribution and/or public performance of the Wrapper Code was in each case without

8    the authorization or consent of Plaintiff or anyone authorized by Plaintiff, and without any other

9    legal excuse, justification or defense.

10       69.    As a result of Defendant's violation of Plaintiff's exclusive rights as alleged

11   herein, Plaintiff has been damaged, and Defendant has been unjustly enriched, in each case as

12   will be the subjects of proof at trial.

13       70.    On information and belief, Defendant's violations as alleged herein have been

14   willful, knowing, malicious, fraudulent and in bad faith, and have been with willful and

15   deliberate disregard for the rights of and consequences to Plaintiff and others, thus entitling

16   Plaintiff to an award of exemplary damages.

17       71.    On information and belief, as a direct and proximate result of Defendant's

18   copyright infringements as alleged herein, Plaintiff has suffered and continues to suffer

19   irreparable harm for which Plaintiff has no adequate remedy at law.  That irreparable harm will

20   continue unless and until such violations are enjoined, thus entitling Plaintiff to injunctive relief.

21                      **Second Cause of Action**
                **False Designation of Origin/Servicemark Infringement**
22                          **(15 U.S.C. § 1125(a))**

23       72.    Plaintiff incorporates by reference all prior allegations as though fully set forth

24   herein.

25       73.    On information and belief, Plaintiff's "CrossInstall" servicemark (the "Mark") is

26   a distinctive, valid and protectable service mark.

27       74.    On information and belief, as a result of Plaintiff's widespread and continuous use

28   of the Mark in connection with its mobile phone app advertising services, Plaintiff owns the

1  Mark as a service mark, to include without limitation as used in connection with Playable Ads
2  and related services.

3      75.    On information and belief, the Mark is widely known and recognized by mobile
4  phone video game and other mobile phone app publishers, and therefore serves to distinguish
5  Plaintiff's advertising services from those of Plaintiff's competitors.

6      76.    Also on information and belief, as a result of that recognition and Plaintiff's
7  strong reputation, the Mark has become synonymous with Plaintiff and with the high-quality,
8  high-value advertising services that Plaintiff provides.

9      77.    On information and belief, Defendant's above-described use of the
10  "CrossChannel" name has caused and resulted in, and is likely to continue to cause and result in,
11  consumer confusion as to the source, sponsorship, affiliation, or approval of Defendant's
12  services.

13      78.    On information and belief, Defendant's use of the CrossChannel name has
14  confused, and will continue to confuse, Plaintiff's and Defendant's customers and prospective
15  customers into believing that Defendant's Playable Ads and other mobile phone app advertising
16  services originated and originate with Defendant.

17      79.    Defendant's use of the CrossChannel name has been without Plaintiff's consent.

18      80.    As a result of Defendant's infringement of the Mark, Plaintiff has been damaged,
19  and Defendant has been unjustly enriched, in each case in amounts to be proved at trial.

20      81.    On information and belief, Defendant's violations as alleged herein have been
21  willful, knowing, malicious, fraudulent and in bad faith, and with the intention of confusing
22  consumers, thus entitling Plaintiff to an award of exemplary damages.

23      82.    On information and belief, as a direct and proximate result of Defendants'
24  infringement of the Mark, Plaintiff has suffered and continues to suffer irreparable harm for
25  which Plaintiff has no adequate remedy at law.  That irreparable harm will continue unless and
26  until Defendant's violations are enjoined, thus entitling Plaintiff to injunctive relief.

27

28  ///

### Third Cause of Action
### False Designation of Origin/Trade Dress Infringement
### (15 U.S.C. § 1125(a))

83.     Plaintiff incorporates by reference all prior allegations as though fully set forth herein.

84.     On information and belief, the Trade Dress is unique and distinctive as among other providers of Playable Ads and mobile phone app advertising services.

85.     The Trade Dress is non-functional, including insofar as it makes no contribution to the function of Plaintiff's Playable Ads, and is not amongst the benefits that Plaintiff's customers or others receive in connection with Plaintiff's mobile phone video game advertising services, and does not provide a utilitarian advantage to Plaintiff or to Plaintiff's Playable Ads, and is in no way a required design element in light of myriad alternative Playable Ad designs.

86.     On information and belief, as a result of Plaintiff's widespread and continuous use of the Trade Dress in connection with its mobile phone app advertising services, Plaintiff owns the Trade Dress and all rights, title and interest thereto, including without limitation as used in connection with Playable Ads and related services.

87.     On information and belief, the Trade Dress is widely known and recognized by mobile phone video game and other mobile phone app publishers, and therefore serves to distinguish Plaintiff's advertising services from those of Plaintiff's competitors.

88.     Also on information and belief, as a result of that recognition and Plaintiff's strong reputation, the Trade Dress has become synonymous with Plaintiff and with the high-quality, high-value advertising services that Plaintiff provides.

89.     On information and belief, Defendant's above-described use of the Trade Dress has caused and resulted in, and is likely to continue to cause and result in, consumer confusion as to the source, sponsorship, affiliation, or approval of Defendant's services.

90.     On information and belief, Defendant's use of the Trade Dress has confused, and will continue to confuse, Plaintiff's and Defendant's customers and prospective customers into believing that Defendant's Playable Ads and other mobile phone app advertising services originated and originate with Defendant.

91.     Defendant's use of the Trade Dress has been without Plaintiff's consent.

92.     As a result of Defendant's infringement of the Trade Dress, Plaintiff has been damaged, and Defendant has been unjustly enriched, in each case in amounts to be proved at trial.

93.     On information and belief, Defendant's violations as alleged herein have been willful, knowing, malicious, fraudulent and in bad faith, and with the intention of confusing consumers, thus entitling Plaintiff to an award of exemplary damages.

94.     On information and belief, as a direct and proximate result of Defendants' infringement of the Trade Dress, Plaintiff has suffered and continues to suffer irreparable harm for which Plaintiff has no adequate remedy at law.  That irreparable harm will continue unless and until Defendant's violations are enjoined, thus entitling Plaintiff to injunctive relief.

**Fourth Cause of Action**
**Cybersquatting**
**(15 U.S.C. § 1125(d))**

95.     Plaintiff incorporates by reference all prior allegations as though fully set forth herein.

96.     On information and belief, starting in or around the spring of 2016, Defendant registered and/or began using the "crosschannel.com" domain name (the "Domain Name") in connection with the advertising and promotion of its Playable Ads and other mobile phone app advertising services.

97.     On information and belief, the Domain Name is confusingly similar to the Mark as owned by Plaintiff.

98.     On information and belief, in registering and/or using the Domain Name, defendant acted in bad faith and with the bad faith intent of profiting from the Mark and from Plaintiff's goodwill appurtenant thereto.

99.     Defendant's use of the Domain Name has been without Plaintiff's consent.

100.    As a result of Defendant's above-alleged use of the Domain Name, Plaintiff has been damaged, and Defendant has been unjustly enriched, in each case in amounts to be proved at trial.

101.    On information and belief, Defendant's violations as alleged herein have been willful, knowing, malicious, fraudulent and in bad faith, and with the intention of confusing consumers, thus entitling Plaintiff to an award of exemplary damages.

102.    On information and belief, as a direct and proximate result of Defendants' above-alleged use of the Domain Name, Plaintiff has suffered and continues to suffer irreparable harm for which Plaintiff has no adequate remedy at law.  That irreparable harm will continue unless and until Defendant's violations are enjoined, thus entitling Plaintiff to injunctive relief.

///

## VII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests judgment against Defendant as follows:

1.   Temporary, preliminary and permanent injunctive relief requiring Defendant to:

    a.   Immediately cease and desist from all further use of the Code (to include the Wrapper Code);

    b.   Immediately cease and desist from all further use of the CrossChannel name, the Trade Dress and the Domain Name, in each case in connection with the promotion or advertising of Playable Ads and other mobile phone app and mobile phone video game advertising services; and

    c.   Immediately transfer the Domain Name to Plaintiff, the costs of such transfer to be borne by Defendant;

2.   Statutory damages as permitted by law;

3.   Restitution and/or disgorgement according to proof;

4.   General and special damages according to proof;

5.   Exemplary and/or punitive damages according to proof;

6.   An award of Plaintiffs' attorneys' fees and cost of suit; and

7.   Such other relief as the court may deem just and proper.

Dated: June 16, 2017                      BURGOYNE LAW GROUP


By:_____
    Henry M. Burgoyne, III
    *Attorney for Plaintiff CrossInstall, Inc.*

1

### **DEMAND FOR JURY TRIAL**

2   Pursuant to Federal Rules of Civil Procedure, Rule 38(b), Plaintiff demands a trial by jury

3   as to all issues so triable in this action.

4   Dated: June 16, 2017                    BURGOYNE LAW GROUP

5

6   By: _____

7   Henry M. Burgoyne, III
    *Attorney for Plaintiff CrossInstall, Inc.*

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28